# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AVIVA STAHL,

7201  4ᵗʰ Avenue, Apt D7

Brooklyn, NY 11209

         *Plaintiff*,

     v.

DEFENSE INTELLIGENCE AGENCY,

7400 Pentagon
Washington, DC 20301-7400

         *Defendant*.

Civil Action No.

## COMPLAINT

1. This lawsuit is an action under the Freedom of Information Act, 5 U.S.C. §552, et seq., seeking production of records responsive to a request submitted by freelance reporter Aviva Stahl to the United States Defense Intelligence Agency.

### Jurisdiction and Venue

2. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the defendants under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1331, 2201(a), and 2202.

3. Venue is appropriate in this Court under 5 U.S.C. §(a)(4)(B) and 28 U.S.C. §1391.

## Parties

4. Aviva Stahl is a freelance investigative journalist based in Brooklyn. Her work has been published by outlets including *the New York Times, the Guardian, Rolling Stone*, *the Intercept, the Nation, Vice Magazine, Gothamist,* among others.

5. The Defense Intelligence Agency is a Department of Defense combat support agency. The DIA produces, analyzes, and disseminates military intelligence information.

## Facts

6. Ms. Stahl has been investigating the conditions under which a detainee, Mr. Ali al-Marri, was interrogated. She has uncovered allegations and evidence that he was tortured while held by American authorities on American soil.

7. Ms. Stahl's investigation has focused on former FBI agent Ali Soufan and his interactions with Mr. al-Marri.

### Background related to Mr. Soufan

8. Mr. Soufan joined the FBI in 1997. In 2011, he published a redacted, detailed account of his time in the FBI in his memoir *The Black Banners*.

9. In August 2020, *The Black Banners* was be republished without CIA redactions.

10. In 2009, Mr. Soufan testified in front of Congress about the use of enhancement interrogation techniques. Green-lighting these methods "was one of the worst and most harmful decisions made in our efforts against al Qaeda," he said. He told the audience he'd long objected to the use of enhanced interrogation techniques, even when they had powerful backers. "I stood up

then for the same reason I'm willing to take on critics now, because I took an oath swearing to protect this great nation," he testified.

11. Since publishing his memoir and testifying in front of Congress, Mr. Soufan has become one of the most vocal and visible former law enforcement officers who served in the War on Terror to openly oppose the enhanced interrogation techniques and other forms of torture.

### Background related to Mr. al-Marri

12. In December 2001, Mr. al-Marri was arrested. In 2003, he was declared an enemy combatant and transferred to the Naval Consolidated Brig in Charleston, South Carolina.

13. He was one of only three "enemy combatants" the U.S. government detained indefinitely on American soil after 9/11.

14. During his first years at the Brig, Mr. al-Marri was denied access to legal counsel and subjected to interrogation methods that would be otherwise impermissible on U.S. soil.

15. In 2009, Mr. al-Marri was transferred to federal criminal custody and prosecuted on terrorism charges. He pleaded guilty and served several years in federal prison before being released in 2015.

16. Today he lives in Doha, Qatar.

### Interactions between Mr. Soufan and Mr. al Marri

17. Mr. Soufan was a member of al-Marri's interrogation team.

18. Visitor logs from the Brig reveal that Mr. Soufan was present for several interrogation sessions of the detainee between December 2003 and March 2004.

19. For over a year after Mr. al-Marri's arrival at the Brig, including all of the time he was being interrogated by Mr. Soufan, al-Marri was not permitted to communicate with anyone outside the prison or contact an attorney.

20. He was detained in a small, cold cell on a tier by himself, without access to sunlight or fresh air.

21. During this time, he was also subject to forcible shaving and extensive sleep deprivation. He was made to sleep on a metal rack. He was sometimes denied toilet paper and had to use his hands to wipe himself. Despite his request, he was not given a prayer rug or Quran.

22. When Mr. Soufan arrived at the Brig on December 20, 2003, Mr. al-Marri had been there for half a year.

23. According to Mr. al-Marri, over the course of his interrogations with Mr. Soufan, the FBI agent often threatened him and his family.

24. Mr. Soufan said he'd arrange for Mr. al-Marri and his family to lose their Qatari citizenship, that he'd fake al-Marri's escape and bring him to a black site, and that American soldiers would sexually assault him and his wife. During one interrogation, according to al-Marri, Soufan told him he would murder his children.

25. According to Mr. al-Marri, these threats were all made in Arabic, which meant they had a greater effect on Mr. al-Marri since he understood the nuance of what was being communicated.

26. There was never another Arabic speaker in the room.

27. Summaries of the military's interrogation notes, which the government was forced to produce after Mr. al-Marri was transferred into federal custody, corroborate his account of being threatened.

28. "The Interrogator told 052"—al-Marri— "that he had a job to do, and if [he] would not cooperate, he would have to have the Saudi and Qatari authorities round up his family. He then proceeded to mention all of 052's siblings and some of their spouses," says an entry from January 17, 2004.

29. Visitor logs prove that Mr. Soufan was one of five individuals signed into the Brig on that date.

30. During one particular interrogation in March 2004, Mr. al-Marri was chained to a chair using leg irons. He was chanting the Quran and refusing to answer questions. In response, according to Mr. al-Marri, one of the interrogators in the room forcibly opened his mouth and placed a pair of socks inside. Another agent taped his mouth shut.

31. The interrogators resumed questioning Mr. al-Marri. At some point several minutes later, according to Mr. al-Marri's memory, the socks moved deeper into his throat and he began to choke.

32. Mr. al-Marri believed he was going to die

33. Interrogators then removed the tape and socks from his mouth.

34. Summary notes of the military's interrogation of Mr. al-Marri from March 11, 2004, state that cotton or cloth had been placed on ("but not inserted in") the detainee's mouth under several layers of tape. "Al-Marri had no difficulty breathing and did not appear to gag, except for a

brief moment at the end when he was removing duct tape from covering his mouth," the notes specify.

35. Visitor logs show that Soufan was signed into the Brig on the date of this interrogation session.

36. The government has admitted to using inhumane tactics during that particular interrogation session. "With the exception of the use of duct tape described in a separate memorandum"— the one dated March 11—"the interrogators followed interrogation procedures consistent with the Army Field Manual," states a military record later released to Mr. al-Mari's defense.

37. According to Andy Savage, who represented al-Marri during his time at the Brig, the detainee told him as early as 2005 or 2006 that he had been dryboarded by an Arabic-speaking FBI agent, who called himself Ali.

38. As is custom, the names of Mr. al-Marri's interrogators were not provided to his defense team. In August 2009, as Mr. al-Marri's legal team prepared for his criminal sentencing hearing, his lawyer wrote a letter to the prosecutor requesting access to one of his client's interrogators - "an individual who Mr. Al-Marri describes as a Lebanese gentleman who identified himself as 'Ali.'"

39. Mr. al-Marri's sentencing hearing took place in October 2009. At the sentencing, Mr. al-Marri's attorney said: "There is one who participated in the events of March 11, 2004… [who] testified this year before Congress, the Senate Judiciary Committee in May of this year, where—he...condemned the enhanced interrogation techniques," had also participated in the March 11 interrogation session. "That was the day that Mr. al-Marri was not waterboarded, but the effect of the interrogation techniques were the same."

## Ms. Stahl's FOIA request for the documents

40. As part of her efforts to follow up on the information she had amassed, on April 1, 2021 Ms. Stahl emailed a FOIA request to foia1@dodiis.mil, as directed by the DIA on its FOIA website, www.dia.mil/foia.aspx.

41. The request asked for the declassification and release of records related to the interrogation of Mr. al-Marri, who was interrogated by the Defense Intelligence Agency when he was detained at the Naval Brig in Charleston, South Carolina.

42. Specifically, the request was for all records that relate to the interrogations that took place over 2003 and 2004 and records related to summaries of those interrogations previously prepared by the DIA.

43. Ms. Stahl also requested expedited processing of the FOIA request.

44. Having received not even an acknowledgment of receipt, Ms. Stahl followed with a second email to the DIA FOIA address on April 19, 2021.

45. To date, Ms. Stahl has heard nothing from the DIA in response to her FOIA.

## Cause of Action

46. The DIA failed to respond to Ms. Stahl's properly submitted FOIA request within the statutory time limit.

47. The DIA wrongly withheld documents responsive to Ms. Stahl's FOIA request.

48. Ms. Stahl has a statutory right to the records she seeks.

49. By failing to respond at all, DIA has violated FOIA.

## REQUESTED RELIEF

Ms. Stahl therefore respectfully requests that this Court:

1. Declare that the records sought by Ms. Stahl are subject to FOIA,

2. Declare that Ms. Stahl is entitled to a fee waiver,

3. Order the DIA to disclose the requested records,

4. Award costs and reasonable attorneys' fees under 5 U.S.C. § 552 (a)(4)(E), and

5. Grant any other relief that the Court considers just and proper.

Respectfully submitted,                    _/s/ Deborah M. Golden_____
                                           Deborah M. Golden, D.C. Bar #470578
                                           The Law Office of Deborah M. Golden
                                           700 Pennsylvania Ave. SE, 2nd Floor
                                           Washington, D.C.  20003
                                           Telephone: (202) 630-0332
                                           dgolden@debgoldenlaw.com

                                           *Counsel for Plaintiff*

Dated: September 9, 2021